IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Michelle Stancil, | ) | Case No. 6:23-cv-06603-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Prisma Health, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's motion for summary judgment. [Doc. 25.] In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2), D.S.C., this matter was referred to United States Magistrate Judge Thomas E. Rogers, III, for pre-trial proceedings.

On June 24, 2025, the Magistrate Judge issued a Report and Recommendation ("Report") recommending that Defendant's motion for summary judgment be granted. [Doc. 38.] The Magistrate Judge advised the parties of the procedures and requirements for filing objections to the Report and the serious consequences if they failed to do so. [Doc. 38-1.] Plaintiff filed objections to the Report on July 7, 2025, and Defendant filed a reply to Plaintiff's objections on July 21, 2025. [Docs. 39; 41.] For the reasons discussed below, the Court grants Defendant's motion for summary judgment.

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *See Mathews v. Weber*, 423 U.S. 261, 270–71

(1976).  The Court is charged with making a de novo determination of any portion of the Report of the Magistrate Judge to which a specific objection is made.  The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions.  *See* 28 U.S.C. § 636(b). The Court will review the Report only for clear error in the absence of an objection.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" (internal quotation marks omitted)).

## **BACKGROUND**

In ruling on a motion for summary judgment, this Court views the facts and reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).  Viewed in the light most favorable to Plaintiff, the summary judgment record reveals the following facts.

**Plaintiff's Employment with Defendant**

Plaintiff, who is Caucasian, began working for Defendant's predecessor, Greenville Hospital System, in January 1989, and continued working for it and Defendant in various roles until her termination on May 4, 2023.  [Docs. 30-1; 30-3 at 53 (59:22–24).] When she was terminated, she had been working as a patient access specialist for more

than 23 years and was working in the emergency room.[1] [Docs. 30-1; 30-3 at 7 (13:14–19).] Nancy Sanders, who is African American, was Plaintiff's supervisor at the time she was terminated, and Sanders reported to Michele Sitton, who is biracial, having a mother of Latino descent and a Caucasian father.[2] [Docs. 30-2 at 9–10 (13:20–14:7), 66 (70:23–25); 30-3 at 3–4 (9:12–10:10), 52 (58:5–10).]

**Plaintiff's Level 2 Corrective Action**

In March 2023, Sanders issued a Level 2 corrective action to Plaintiff related to events that occurred on February 21, 2023.[3] [Doc. 25-3 at 73–74.] The comment section of the Level 2 corrective action provides:

> **Issues**: Job Role Performances
> February 21, 2023, [Plaintiff] failed to follow proper registration protocols. Patient demographics first name spelled wrong and no insurance coverage
> attached but provided by patient.
> **Communication**: Sent email to the team member who corrected the registration. At her personal home email address which the team member had not provided to her for personal use.
>
> **Expectations**: Immediate and sustained improvement following the Prisma Health Behaviors Expectations and Patient Access Specialist job duties.

---

[1] The primary duties related to patient access in the emergency room are to identify patients, obtain their demographic and insurance information, collect copays, and ensure Defendant has the proper documentation. [Doc. 30-3 at 7–9 (13:14–15:5).]

[2] The Court notes that the Report states that Sitton is African American and Hispanic. [Doc. 38 at 2 (citing Doc. 30-3 at 53).] Although Sitton testified that she has checked boxes on forms identifying her race as African American, biracial, and Hispanic [Doc. 30-3 at 52–53 (58:11–59:11)], she specifically testified that her "mother is from Latino descent and [her] father is Caucasian" [*id.* at 52 (58:9–10)].

[3] A Level 2 corrective action is generally the second step in Defendant's progressive discipline process but may be the first step for a more severe infraction. [Doc. 30-8 at 18–19 (11:25–12:10).]

> **Consequences**: Additional corrective action up to and including termination.

[*Id.* at 73.]

Sanders' notes regarding the February 21, 2023, incident indicate that Plaintiff started a patient registration on that date but later in the day, another patient access specialist, Gail Featherstone,[4] added insurance information to the patient's account and corrected the spelling of the patient's name. [*Id.* at 79; *see also* Doc. 30-2 at 54–55 (58:9–59:11).] The following day, Plaintiff sent an email to Featherstone at her work email address, thanking her for updating the patient's information and informing her that Plaintiff had planned to update it that morning because she had run out of time the day before. [Doc. 25-3 at 77.] Plaintiff and Featherstone then exchanged multiple emails about the issue, and at some point during the exchange, Featherstone's personal email address was swapped for her work email address.[5] [*Id.* at 75–77.] The email exchange became contentious, with Featherstone questioning why Plaintiff did not add the insurance information when it would have been just one more five-minute step and Plaintiff asking Featherstone to "please stay in [her] own lane" and stating that she was "tired of being judged." [*Id.*]

On February 23, 2023, Plaintiff and Featherstone each asked to meet with Sanders to discuss the events from February 21. [*Id.* at 80–81.] Sanders first met with Plaintiff, who shared her frustration with second-shift team members going behind her back to work on her accounts. [*Id.* at 80.] Sanders later met with Featherstone, who explained

---

[4] Featherstone is Caucasian. [Doc. 25-10 at 4 ¶ 17.]

[5] Plaintiff testified that she sent the emails to Featherstone's personal and work email addresses. [Doc. 25-2 at 67 (114:8–18).]

that the patient had asked that she correct the spelling of his name when he was being discharged and stated that she thought Plaintiff was being lazy.  [*Id.* at 80–81.] Featherstone also indicated that "she didn't appreciate [Plaintiff] email[ing] her on her personal home email address."  [*Id.* at 81.]  Sanders met with Plaintiff again on February 24, and notified Plaintiff that she would have to consult with human resources about the incident because Plaintiff had included the patient's name and medical record number in the email to Featherstone's personal email address, and Sanders was unsure whether that was a violation of the Health Insurance Portability and Accountability Act of 1996. [*Id.* at 81.]

Ultimately, as noted, Sanders issued Plaintiff a Level 2 corrective action.  In the acknowledgment section of the corrective action, Plaintiff commented:

> Quick registration entered [patient's] name wrong not me. Epic asks that we don't change name until [patient] is discharged so I kept a copy of his [driver's license] and Medicaid card to update the following morning. We have always been told we have three days to update. Manager never told us anything different. I personally update my accounts within 24 hours[.] Since we are accountable for our own registrations, I don't like anyone correcting mine. When I checked it the next morning, [Featherstone] had entered the id number wrong. If I wouldn't have caught that, I would have got into trouble with auditing. I did not think it was a problem for me to double email ([]home/work[]) [Featherstone] because I have emailed her before on different occasions.

[*Id.* at 73.]

**Plaintiff's Complaint About Her Work Environment**

On April 17, 2023, Plaintiff complained to Sanders about Featherstone moving Plaintiff's clipboard.  [*Id.* at 70.]  During the conversation, Plaintiff informed Sanders that she was not going to work in a hostile working environment and Featherstone was not

going to boss her around.  [*Id.*; *see also* Doc. 30-2 at 63–65 (67:18–69:11).]  Sanders replied that Plaintiff was creating the hostile environment, and Plaintiff asked for a human resources contact.  [Docs. 25-3 at 70; 30-2 at 64 (68:3–12).]  Sanders gave Plaintiff Grant Ferguson's name as the person to contact in human resources, and she notified Ferguson that Plaintiff would be calling him.  [Docs. 25-3 at 70; 30-2 at 65 (69:12–22).]  On April 27, 2023, Plaintiff sent an email to Ferguson asking how long an employee would have to wait to apply for a different position after receiving a corrective action, and Ferguson confirmed that Plaintiff would not have to wait because she had only a Level 2 corrective action.  [Doc. 30-5.]

**Plaintiff's Termination**

On May 4, 2023, Sanders issued a Level 4 corrective action—a termination—to Plaintiff.  [Doc. 25-3 at 83; *see* Doc. 30-6 at 14 (16:5–9).]  The comment section of the Level 4 corrective action provides:

> Michelle,
> Falsified a patient record on April 19, 2023. She indicated that the patient was unavailable to secure patients' insurance card. This alone is what stemmed the patient comment as they were concerned that the insurance would be filed incorrectly as no one came to complete that portion of registration. Upon reviewing all the surveillance footage at no time did Michelle attempt to engage with the patient.

[Doc. 25-3 at 83.]

Plaintiff's termination resulted from an investigation Sanders conducted after receiving a survey response completed by a patient's mother.  The survey was completed on April 21, 2023, regarding an emergency department encounter that had occurred on April 19, 2023.  [Doc. 25-9 at 10.]  In the survey response, the patient's mother answered "No" to the question, "Did the person that took your personal and insurance information

treat you with courtesy and respect?"  [*Id.*]  She also wrote, "Person taking information answered a call and left due to forgetting about dentist appointment, said another person would be right back to finish and they never came.  The PA tried s[e]wing my daughter[']s toe without it being numb.  Very bad experience."  [*Id.*]

Sanders was on vacation when the patient's mother completed the survey response.  [Doc. 30-9.]  She returned to the office on Tuesday, April 25.  [*Id.*]  Upon her return, Sanders reviewed the survey response and called the patient's mother, who explained that the employee who started registering her took a personal phone call and then had to leave.  [Doc. 30-2 at 26–27 (30:16–31:20).]  That employee told the mother that another employee would finish the registration, but no one ever came to complete the registration even though the mother sat in the registration area for 30 minutes waiting.  [*Id.*]  When Sanders talked to the patient's mother, she completed the registration by updating the patient's insurance information.  [*Id.* at 51–52 (55:18–56:1).]

After talking to the patient's mother, Sanders reviewed the registration history in Defendant's computer system to confirm which employees were involved in the registration.  [*Id.* at 70 (74:1–12).]  That registration history showed that Lisa Williams[6] started the process and that Plaintiff also worked in the file.  [*Id.* at 70 (74:13–24).]  After learning who had been involved in registering the patient, Sanders met with both Williams and Plaintiff.  [*Id.* at 71 (75:4–13).]

Sanders' notes related to the April 19, 2023, registration indicate that Williams began the registration process, took a cell phone call from her dentist's office, and then left for an appointment she had forgotten about.  [Doc. 25-3 at 84.]  She walked the patient

---

[6] Williams is African American.  [Doc. 25-10 at 4 ¶ 17.]

and her mother back to the lobby and told them a coworker would finish the registration. [*Id.*]  Williams told Sanders that she had informed Plaintiff that the patient was waiting to finish registration.  [*Id.*]

Plaintiff told Sanders that she had gone to the patient's room to obtain the insurance information but marked in the system that she was unable to obtain it "because they probably didn't have it."[7]  [*Id.*]  She also told Sanders that patients lie and "you can't believe what they say."  [*Id.*]

Because of the conflicting information from the patient's mother, who said that no one ever came to complete the registration, and Plaintiff, who said that she had gone to the patient's room to complete the registration, Sanders reviewed security video footage from April 19.  [*Id.*; Doc. 30-2 at 33 (37:18–22).]  After reviewing the security footage, Sanders concluded that Plaintiff had falsified the record because she marked in the system that she was unable to obtain the insurance information but in fact she had never gone to the room to try to get the information.  [Doc. 30-2 at 35–36 (39:16–40:6); *see also id.* at 47–48 (51:22–52:6).]

Sanders considered issuing a Level 3 corrective action—a final warning—to Plaintiff.  [*Id.* at 47 (51:12–21).]  She discussed the appropriate discipline with Sitton and

---

[7] Sanders testified that the registration system has a drop-down box where employees can select "received," "signed," or "unable to obtain" regarding documents like insurance cards.  [Doc. 30-2 at 36–37 (40:17–41:4).]  "Received" is used when the employee gets a paper copy and scans it into the system; "signed" is used when something is submitted and signed electronically; and "unable to obtain" is used when the employee is unable to get a document or information from the patient.  [*Id.* at 36–37 (40:7–41:10).]  Plaintiff testified that she selected "unable to obtain" regarding this patient's insurance information because Williams had not received the information before she left but that Plaintiff had planned to try to get the information.  [Doc. 25-2 at 82–83 (138:25–139:10).]

Ferguson and ultimately issued the Level 4 corrective action, resulting in Plaintiff's termination.[8] [*Id.* at 57–58 (61:17–62:18); Docs. 25-9 at 4 ¶ 17; 30-3 at 32–33 (38:16–39:18); 30-6 at 10–12 (12:5–14:6); 30-8 at 31–32 (24:21–25:23).] During the termination meeting, Plaintiff did not provide any explanation for her actions on April 19. [Doc. 25-2 at 100–01 (160:10–161:19).]

---

[8] Ferguson recommended that Sanders issue a Level 4 corrective action because Plaintiff "was already on a level two corrective action and based on the egregiousness of the situation . . . , [he] felt that from a consistency standpoint and in line with [Defendant's] policies, a termination would be the appropriate step." [Doc. 30-6 at 11 (13:20–25); *see id.* at 10–12 (12:5–14:6), 29 (31:5–11).]

Sanders concluded that both Plaintiff and Williams were responsible for the negative patient survey [Doc. 30-2 at 43 (47:12–16)], and she issued a Level 2 corrective action to Williams for her role in the April 19 events [Doc. 30-10]. The comment section of Williams' Level 2 corrective action provides:

> **Issues:**
> 1. On Wednesday, April 19, 2023 while [Williams] was performing a patient registration in the ED lobby with patient she answered a call on her cell phone from her dentist appointment[]. Leaving the patient and failing to have a conversation with her peer from what can be seen on the video surveillance.
> 2.[ ]Adjusted her hours without approval.
> 3. Failed to document UKG appropriately
> 4.[ ]Failure to handoff patient
> **Communication:**
> [Williams] answered her cell phone while registering patient[,] abandon patient and failure to handoff the patient to her coworker. And failure to adjusted her hours without approval.
> **Expectations:**
> Immediate and sustained improvement following the Prisma Health Behaviors Expectations and Patient Access Specialist job duties and adhering to policy for use of cell phones and other portable communication devices.
> **Consequences:**
> Additional corrective action up to and including termination.

[*Id.* at 4.]

**Plaintiff's Appeal of Her Termination**

The day after she was terminated, Plaintiff sent an email to Ferguson with the subject line, "Wrongful termination and discrimination." [Doc. 30-12 at 3–4.] In the communication, Plaintiff informed Ferguson that the reason she had recently asked about applying for a different job was because she had been working in a hostile working environment, dealing with discrimination and retaliation, since February 23, and that Williams had "experienced the same discrimination." [*Id.* at 4.] She also stated that she had not known she was doing anything wrong on April 19. [*Id.*] In a follow-up email to Ferguson regarding an appeal, Plaintiff indicated that she did not intentionally falsify documents or say that patients lie, that a registered nurse named Tamera ("Nurse Tamera") could verify that she tried to get into the patient's room to obtain the insurance card on April 19, and that "[t]his was one big misunderstanding."[9] [*Id.* at 2.]

Ferguson passed Plaintiff's submission on to Sitton as an appeal of her termination. [Doc. 30-6 at 17 (19:2–17).] Sitton upheld the termination at the first step of the appeals process, and the termination was also upheld at steps two and three.[10] [*Id.* at 17–18 (19:21–20:16).]

---

[9] As Plaintiff explained in her deposition, on April 19, 2023, she asked Nurse Tamera about getting into the room to obtain the patient's insurance information, but Nurse Tamera told Plaintiff that she could not go in the room at that time because someone was in there. [Doc. 25-2 at 85 (141:3–8).] Plaintiff recalled asking Nurse Tamera twice if she could enter the room. [*Id.* at 87 (143: 21–24).]

[10] Ferguson explained that the appeals process is a "a three-step process. The first step is the leader . . . immediately above . . . the leader who conducted the termination. The second step is the leader above that leader. And then the third step is [the] vice president of [human resources] operations and shared services." [Doc. 30-6 at 16–17 (18:21–19:1).]

During the appeals process, Plaintiff complained that she had been subjected to disparate treatment because of her race. [Doc. 30-13.] Specifically, Plaintiff stated, "Sanders and . . . Sitton have issued lesser discipline to the employee that is their same race. I am white. I am unlawfully receiving more severe discipline than my African American peer for the same event." [*Id.*]

**Plaintiff's Replacement**

On June 4, 2023, Katie Padilla replaced Plaintiff as a patient access specialist in the emergency room. [Doc. 25-10 at 4 ¶ 18.] Padilla is Caucasian. [*Id.* at 4 ¶ 17.]

**This Action**

Plaintiff filed this action in December 2023, asserting causes of action for race discrimination and retaliation in violation of Title VII and age discrimination and retaliation in violation in the Age Discrimination in Employment Act (the "ADEA"). [Doc. 1-1 at 3–9.] However, as the Magistrate Judge noted [Doc. 38 at 1], Plaintiff voluntarily withdrew her ADEA causes of action and is proceeding only on her Title VII causes of action [Doc. 30 at 1–2].

## APPLICABLE LAW

**Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is

"genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an

> adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

**Title VII**

Title VII makes it unlawful for an employer "to discharge any individual . . .  because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Additionally, Title VII's retaliation provision forbids an employer from taking action that discriminates against an individual because that individual has either "opposed any practice made an unlawful employment practice by this subchapter" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

Absent direct or indirect evidence of discrimination or retaliation in violation of Title VII, a plaintiff may proceed under the *McDonnell Douglas* "pretext" framework to establish claims of discrimination and retaliation.  *Dickerson v. NHC Healthcare-Charleston, LLC*, No. 2:21-cv-2170-DCN-MGB, 2023 WL 6057394, at *5 (D.S.C. Sept. 18, 2023).  Under this framework, an employee must first prove a prima facie case of discrimination or retaliation.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff succeeds, the burden then shifts to the employer to produce evidence of some legitimate, nondiscriminatory and nonretaliatory reason for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  By providing such an explanation, the employer rebuts the presumption of discrimination or retaliation created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to

13

come forward with some response, simply drops out of the picture." *Id.* at 510–11. If the employer produces evidence of a legitimate, nondiscriminatory and nonretaliatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 804.

To establish a prima facie case of discrimination, "a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). To establish a prima facie case of retaliation, a plaintiff must demonstrate "(1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).

## DISCUSSION

**The Report**

The Magistrate Judge recommends granting Defendant's motion for summary judgment with respect to Plaintiff's discrimination claim because Plaintiff has failed to present evidence sufficient to create issues of fact as to whether she was meeting Defendant's legitimate expectations and whether her termination occurred under circumstances giving rise to an inference of discrimination. [Doc. 38 at 12–19.] With respect to Plaintiff's retaliation claim, the Magistrate Judge recommends granting

Defendant's motion for summary judgment because nothing in the record demonstrates that Plaintiff engaged in protected activity.  [*Id.* at 19–22.]

**Plaintiff's Objections**

Plaintiff has filed lengthy objections to the Report, which the Court categorizes into four main objections.  First, Plaintiff argues that her job performance is a disputed fact for the jury.  [Doc. 39 at 2–7.]  More specifically, Plaintiff contends that she is not required to show flawless performance but merely that she was qualified for the position and meeting expectations at the time of the adverse action and that she satisfies that burden.  [*Id.*]  Next, Plaintiff objects to the Report's exclusion of the pretext analysis and contends that she has proffered sufficient evidence of pretext to survive summary judgment.  [*Id.* at 7–20.]  Plaintiff next argues that the Report incorrectly concluded that Plaintiff did not engage in protected activity.  [*Id.* at 20–28.]  Finally, Plaintiff contends that the Report failed to address Plaintiff's claims under a mixed-motive analysis.  [*Id.* at 28–33.]

**Analysis**

The Court begins by addressing the framework the Magistrate Judge used to analyze Plaintiff's claims.  As the Magistrate Judge noted, Justice Thomas has recently questioned the viability of applying the *McDonnell Douglas* burden-shifting framework, particularly at the summary judgment stage.  [Doc. 38 at 13 n.6 (citing *Hittle v. City of Stockton*, 145 S. Ct. 759, 760–61 (2025) (Thomas, J., dissenting); *Ames v. Ohio Dep't of Youth Servs.,* 605 U.S. 303, 319 (2025) (Thomas, J., concurring)).]  Even more recently, Judge Quattlebaum of the Fourth Circuit Court of Appeals has "join[ed] many other judges and Justices in calling for the clarification, or overturning, of *McDonnell Douglas'* burden-shifting framework."  *Hollis v. Morgan State Univ.*, 153 F.4th 369, 395 (4th Cir. 2025)

15

(Quattlebaum, J., concurring). Nonetheless, as Judge Quattlebaum noted, the Fourth Circuit has "often applied *McDonnell Douglas* at summary judgment." *Id.* at 390. Accordingly, under current Fourth Circuit precedent, it is appropriate for the Court to apply the *McDonnell Douglas* burden-shifting framework to Plaintiff's claims. *Cf. Ames*, 605 U.S. at 308 n.2 ("assum[ing] without deciding that the *McDonnell Douglas* framework applies at the summary-judgment stage of litigation").

And Plaintiff does not argue that the Magistrate Judge should not have applied the *McDonnell Douglas* framework. Instead, Plaintiff contends that the Magistrate Judge should have also applied the mixed-motive framework. [Doc. 39 at 28–33.] As an initial matter, the mixed-motive framework does not apply to Plaintiff's retaliation claim. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (recognizing that *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), "reject[ed] the 'mixed motive' theory of liability for retaliation claims"); *see also Nassar*, 570 U.S. at 360 (holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation"). Moreover, the Court concludes that applying the mixed-motive framework to Plaintiff's discrimination claim does not alter the conclusion that Defendant is entitled to summary judgment on that claim.

### Discrimination Claim

Under the mixed-motive framework, "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins.*, 416 F.3d 310, 318 (4th Cir. 2005). As the Magistrate Judge stated, in this action

16

the undisputed facts are that Plaintiff is Caucasian; her supervisor, Sanders, is African-American. The reason given for Plaintiff's termination was for falsifying a patient record by indicating that she could not obtain insurance information when the patient indicated that she never asked her for her insurance information. When asked about the patient's complaint, Plaintiff told Sanders that she did attempt to obtain the insurance information and insinuated that the patient was lying. Video surveillance footage did not show any attempts by Plaintiff to speak to the patient to obtain the information. Only after Plaintiff was terminated did she make it known to anyone that she attempted to obtain the patient's insurance information by asking the patient's nurse whether she could go into her room and the nurse said no. Plaintiff's African-American coworker engaged in different misconduct at the same time as Plaintiff and received a corrective action but was not terminated. Plaintiff had received a different corrective action two months prior to her termination; her African-American coworker had never previously received a corrective action. Upon her termination, the position was fil[l]ed with someone of Plaintiff's same race.

[Doc. 38 at 19 n.10.] The Court agrees with the Magistrate Judge's conclusion that this evidence is insufficient to create a genuine dispute of fact as to whether Plaintiff's race motivated her termination. Nor does this evidence create a genuine dispute of fact as to whether Plaintiff's termination occurred under circumstances that raise a reasonable inference of unlawful discrimination such that Plaintiff can establish a prima facie case of discrimination under the *McDonnell Douglas* framework.[11] "Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case

---

[11] For the same reasons that no genuine dispute of fact exists as to whether Plaintiff's termination occurred under circumstances that raise a reasonable inference of unlawful discrimination, no genuine dispute of fact exists as to whether Defendant's articulated reason for terminating Plaintiff—her falsification of a patient record following a Level 2 corrective action—was actually a pretext for discrimination.

involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  In this case, Plaintiff has not established a genuine issue of material fact as to the ultimate question of whether she was the victim of intentional race discrimination.

Plaintiff makes several arguments in support of her assertions that race was a motivating factor in her termination and that Defendant's purported reason for terminating her is pretext for race discrimination.[12]  First, she argues that Defendant failed to follow its progressive discipline policy because it skipped issuing Plaintiff a Level 3 corrective action.  [Doc. 39 at 9–11.]  However, Plaintiff has failed to direct the Court to Defendant's progressive discipline policy, and the Court has not found the policy in its review of the evidence submitted in the case.  Instead, Plaintiff cites to Ferguson's deposition testimony for the proposition that Defendant's "discipline policy generally contemplates a progression of corrective steps before termination, including verbal counseling, written warnings, and only then more severe actions."  [*Id.* at 10 (citing Doc. 30-6 at 13–16 (15:8–18:11)).]  But Ferguson testified that skipping a step of discipline "happens very frequently" and that the policy allows Defendant to move straight to termination for more

---

[12] Because, as stated, the ultimate question is the same regardless of the type of evidence offered or analytical framework employed, the Court addresses collectively all of Plaintiff's arguments that she was terminated, at least in part, because of her race.

egregious or severe offenses based on the particular situation.[13]  [Doc. 30-6 at 15 (17:3–19).]  Thus, Plaintiff has failed to establish a genuine dispute of fact related to whether Defendant failed to follow its progressive discipline policy.

Plaintiff next argues that Williams, who is African American, engaged in substantially similar conduct but received only a Level 2 corrective action.  [Doc. 39 at 11–16.]  However, as the Magistrate Judge explained, Williams engaged in different conduct than Plaintiff and did not have a previous corrective action.  [Doc. 38 at 18–19.] The Court agrees that Williams is not an appropriate comparator and that no inference of discrimination arises from her receiving a different level of discipline.  *See Yoon v. Sebelius*, 481 F. App'x 848, 850 (4th Cir. 2012) (finding insufficient comparability when the purported comparators did not have a history of misconduct or previous reprimands like the plaintiff).

Plaintiff also argues that Defendant exaggerated the infraction underlying her termination, that her termination notice contains factual inaccuracies, and that Nurse Tamera's testimony contradicts Defendant's falsification claim.  [Doc. 39 at 17–18.] These arguments stem from Plaintiff's assertion that Sanders did not properly investigate whether Plaintiff attempted to obtain the patient's insurance information and, had she talked to Nurse Tamera, Sanders would have known that Nurse Tamera told Plaintiff she could not go in the patient's room.  [*Id.* at 17 (contending that "Defendant did not establish intentional misconduct but instead relied on an investigation lacking direct witness

---

[13] Indeed, as noted, Sanders issued a Level 2 corrective action to Williams for her role in the events on April 19, 2023.  [Doc. 30-10.]  At the time, Williams had not received any other disciplinary actions, and Sanders skipped issuing a Level 1 corrective action. [Doc. 30-2 at 62 (66:7–14).]

testimony or corroborative evidence from the patient, when . . . evidence from Nurse [Tamera] existed exonerating Plaintiff" and that the Level 4 corrective action's statement that Plaintiff did not attempt to engage with the patient is "'proven inaccurate b[y] the nurse's confirmation otherwise'"); 18 (arguing that Nurse Tamera's account of the events refutes that Plaintiff falsified records).] However, as the Magistrate Judge noted, at the time the termination decision was made, neither Sanders, Sitton, nor Ferguson knew that Plaintiff had asked Nurse Tamera about getting the patient's insurance information. [Doc. 38 at 17 n.9.] And whether Sanders would have learned more had she investigated more thoroughly is immaterial; what matters for purposes of proving discrimination is the decision maker's perception of the underlying facts. *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even if these investigations were improper or substandard, that . . . certainly does not give rise to a reasonable inference that her race . . . was the real reason for the termination."); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant . . . ." (internal quotation marks omitted)); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (internal quotation marks omitted)). Plaintiff has failed to direct the Court to any evidence suggesting that Sanders believed Plaintiff had been truthful about attempting to obtain the insurance information.[14]

---

[14] The same is true regarding Plaintiff's assertion that Defendant exaggerated the February 2023 incident, which Plaintiff considers a minor disagreement that did not warrant a Level 2 corrective action. [Doc. 39 at 18.] It is the decision maker's perception that is relevant, and Plaintiff has failed to show that Sanders did not believe that Plaintiff's sending an email to Featherstone's personal email address warranted a Level 2 corrective action.

Moreover, Plaintiff provided no explanation before she was terminated [Docs. 25-2 at 100–01 (160:10–161:19); 30-2 at 73–75 (77:21–79:11)], and she first informed Defendant that Nurse Tamera had told her she could not enter the patient's room in her email about an appeal after she was terminated [Doc. 30-12 at 2]. Accordingly, Plaintiff has failed to create a genuine issue of fact as to whether Sanders, as the decision maker, did not believe Plaintiff had falsified a patient record.

In sum, Plaintiff has failed to establish a genuine issue of material fact as to the ultimate question of whether she was the victim of intentional race discrimination.[15] *See Hill*, 354 F.3d at 286. That Plaintiff may have been made to feel that she was treated unfairly, even if true, is not probative evidence of discrimination without more. *See Hairsine v. James*, 517 F. Supp. 2d 301, 308–09 (D.D.C. 2007) ("A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects against discriminatory decisions, not wrong ones.").] Plaintiff has failed to produce any evidence that she was discriminated against because of her race or that her termination was motivated by her race. Accordingly, Defendant is entitled to summary judgment regarding Plaintiff's race discrimination claim.

### *Retaliation Claim*

As noted, the Magistrate Judge concluded that nothing in the record demonstrates that Plaintiff engaged in protected activity. [Doc. 38 at 19–22.] In her objections, Plaintiff

---

[15] The Court notes that Plaintiff also argues Defendant failed to consider Plaintiff's longstanding employment record as a mitigating factor in determining her discipline. [Doc. 39 at 16–17.] However, Plaintiff fails to direct the Court to any case law to support her position that failure to consider her full employment history demonstrates any racial animus in the context of determining the appropriate discipline in specific instances of workplace misconduct.

argues that she engaged in protected activity when she (a) complained to Sanders on April 17, 2023, that Sanders was creating a hostile work environment and informed Sanders that Plaintiff intended to escalate the matter to human resources, and (b) sent a transfer request email to Ferguson before she was terminated.  [Doc. 39 at 20–25.] Accordingly, Plaintiff contends that she engaged in protected oppositional activity.[16]

"Employees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (internal quotation marks omitted).  Here, on April 17, 2023, Plaintiff complained to Sanders about Featherstone moving Plaintiff's clipboard and informed Sanders that Plaintiff was not going to work in a hostile working environment and Featherstone was not going to boss her around.  [Doc. 25-3 at 70; *see also* Doc. 30-2 at 63–65 (67:18–69:11).]  As noted, Featherstone is Caucasian like Plaintiff, so nothing about this complaint would have signaled to Sanders that Plaintiff believed she was opposing race discrimination.  *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("Our cases hold that an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct.").  Although Plaintiff now contends that her complaint to Sanders was not just about Featherstone but also to complain that Sanders was creating a hostile work environment for Plaintiff [Doc. 39 at 22], she has failed to direct the Court to any evidence that she accused Sanders of creating a hostile work environment on April 17 [*see generally id.* at 22–25]; *Pauling v.*

---

[16] Through the two clauses of the antiretaliation provision, Title VII protects activities that "fall into two distinct categories: participation or opposition."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

22

*Greenville Transit Auth.*, No. 6:05-1372-HMH-BHH, 2006 WL 3354512, at *8 (D.S.C. Nov. 16, 2006) ("It is not the Court's responsibility to comb the record either for supporting evidence or to craft arguments for a party."). Indeed, Plaintiff testified that she complained to Sanders about Featherstone. [Doc. 25-2 at 34 (70:13–20), 41 (86:3–8), 43–44 (88:20–89:1), 108 (185:18–22); *see also* Doc. 30-12 at 7 (Plaintiff's post-termination email to Ferguson stating "that all of this stemmed from [her] complaint against [Featherstone]").] And nothing in Plaintiff's email to Ferguson on April 27, 2023, would have signaled to Ferguson that Plaintiff was opposing discriminatory activity because Plaintiff merely asked Ferguson how long an employee would have to wait to apply for a different position after receiving a corrective action. [Doc. 30-5.] Further, Plaintiff testified that, before she was terminated, she did not complain to anyone employed by Defendant that she had been discriminated against because of her race or that she had been retaliated against. [Doc. 25-2 at 37 (76:2–19).] Viewing the evidence in a light most favorable to Plaintiff, the Court concludes no reasonable jury could find that Plaintiff's complaint to Sanders and/or email to Ferguson opposed employment actions that are unlawful under Title VII. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

Wherefore, based on the above, the Court accepts the Report and Recommendation of the Magistrate Judge to the extent it is consistent with this Order. Accordingly, Defendant's motion for summary judgment [Doc. 25] is GRANTED.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

October 29, 2025
Greenville, South Carolina